IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Stephanie M. Campbell,              :
            Plaintiff             :      Civil Action 2:12-cv-00446

       v.                       :      Judge Sargus

Carolyn Colvin,                :      Magistrate Judge Abel
Commissioner of Social Security,
            Defendant      :

**REPORT AND RECOMMENDATION**

Plaintiff Stephanie M. Campbell brings this action under 42 U.S.C. §§405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security denying her application for Supplemental Security Income benefits.  This matter is before the Magistrate Judge for a report and recommendation on the parties' cross-motions for summary judgment.

**<u>Summary of Issues.</u>** Plaintiff Stephanie M. Campbell alleges she became disabled in September 2008 at age 28. She was single and lived with her eleven year old son. Her income consisted of child support payments. Although she had worked in the past, her work never constituted substantial gainful employment.  The administrative law judge found that plaintiff had the following severe impairments: hypotension with syncopal episodes, mitral valve prolapse and mild regurgitation, and lumbar and thoracic contusion/sprain/spasm  with chronic pain and radiculopathy, major depression, posttraumatic stress disorder, generalized anxiety disorder, personality disorder with antisocial features; panic disorder with agoraphobia, and cannabis abuse.

The administrative law judge found that plaintiff retained the residual functional capacity for a reduced range of low stress jobs involving unskilled, simple, routine and repetitive tasks having light exertional demands. She could have occasional and superficial contact with supervisors and coworkers and minimal to no contact with the public.

Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge failed to follow Social Security Ruling 06-3p with respect to the opinion of Campbell's treating psychiatric nurse practitioner;
- The administrative law judge improperly assigned great weight to the opinions of the State agency reviewers; and,
- The testimony of the vocational expert was not supported by substantial evidence.

**Procedural History.**  Plaintiff Stephanie M. Campbell filed her application for disability insurance benefits on September 19, 2008, alleging that she became disabled on September 10, 2006, at age 28, by panic attacks, blood pressure, bad nerves, heart problems and a blood clot in her right leg.  (R. 147, 174.)  The application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.  On August 12, 2010, an administrative law judge held a hearing at which plaintiff, represented by counsel, appeared and testified.  (R. 32.)  A vocational expert and a medical advisor also testified.  On September 7, 2010, the administrative law judge issued a decision finding that Campbell was not disabled within the meaning of the Act.  (R. 9-26.)  On March 28, 2012, the Appeals Council

2

denied plaintiff's request for review and adopted the administrative law judge's

decision as the final decision of the Commissioner of Social Security.  (R. 1-3.)

**Age, Education, and Work Experience.**  Stephanie M. Campbell was born

August 11, 1978.   (R. 147.) She completed the 11th grade.  (R. 179.)  She has worked as a

bagger at a grocery store, a laborer and a maid.  She last worked November 1, 2005.  (R.

174.)

**Plaintiff's Testimony.**  The administrative law judge fairly summarized

Campbell's testimony as follows:

> At the hearing the claimant testified that she lived in a trailer with
> her eleven-year-old son. She stated that she attended school to the
> eleventh grade and worked in 2008 as a self-employed babysitter; she
> babysat two children, ages five and seven. She testified that she did
> not think that there was any job she could perform due to shortness
> of breath when walking as well as difficulty being around people.
> She stated that she tried to work as a housekeeper at hotels prior to
> 2008, but was let go because she "was not moving fast enough" due
> to shortness of breath.
>
> The claimant further testified that she suffered from a mitral valve
> prolapse with chest pain and shortness of breath. She stated that she
> experienced blackouts 2-3 times a week on average, particularly if
> she stood too long. She testified that she smoked a pack and a half of
> cigarettes daily. She stated that she was unable to take a stress test in
> February 2010 as it was on an incline and increased her shortness of
> breath.
>
> The claimant also testified that she was treated by Dr. Sayegh for
> constant back pain due to a dislocated disc in her lower back;
> however, the last time she saw Dr. Sayegh was about two years ago.
> She stated that her back pain started in October of 2009 when she fell
> down a flight of stairs and described the pain as if someone were
> cutting her with a knife. She testified that sitting on the couch with a
> pillow behind her eased the pain somewhat.

With regard to mental impairments, the claimant testified that she had participated in counseling sessions with Mr. Bova for symptoms of depression and anxiety for the past two years. She stated at the time she did not feel like doing anything; she got "all shaky" and just wanted to be by herself. She stated that she suffered from mood swings twice a month and racing thoughts twice a week in addition to constant feelings of helplessness and hopelessness. She testified that she had thoughts of harming self and experienced such thoughts about a month ago. She stated that she had trouble trusting people, especially men as she was molested by her uncle when she was 15-16 years old. She testified that she had flashbacks of this experience, which made her feel dirty.  County songs that she heard while partying with her uncle brought on flashbacks of the abuse as well as being touched by her boyfriend in "certain ways." She testified that being around people caused her to experience panic attacks; she had panic attacks, described as getting "shaky inside," about four times a month. At the questioning of the undersigned, the claimant testified that her difficulties being around other people started at the beginning of the previous year due to depression.

(R. 16-17.)

**Medical Evidence of Record.**  The administrative law judge's decision fairly sets out the relevant medical evidence of record.  This Report and Recommendation will only briefly summarize that evidence.

**Physical Impairments.**

An October 11, 2006 echocardiogram showed estimated ejection fraction 68%. There was mild systolic mitral valve prolapse with trace mild mitral insufficiency. (R. 356-57.)

A May 31, 2007 MRI revealed significant intramuscular edema involving the vastus medialis musculature with an associated large intra- and extra muscular or resolving hematoma. (R. 251.)

4

Elizabeth Das, M.D. On October 5, 2007, Dr. Das, a State agency reviewing physician completed a physical residual functional capacity assessment. Dr. Das opined that plaintiff could occasionally lift and/or carry 50 pounds and frequently lift and/or carry 25 pounds. Plaintiff could stand and/or walk for about 6 hours in an 8-hour day. Campbell was unlimited in her ability to push and/or pull. (R. 302-09.)

An August 1, 2008 echocardiogram revealed moderately to severely sclerotic mitral valve with mild mitral valvular prolapse and a jet of moderately severe to severe posterolaterally directed mitral insufficiency. (R. 311.)

Heather Horton, M.D. On August 25, 2008, Dr. Horton, a cardiovascular doctor, examined plaintiff. Dr. Horton reviewed August 1, 2008 echo reports that showed normal left ventricular size, no wall motion abnormalities, moderate to severe mitral regurgitation with mitral valve prolapse, mild tricuspid regurgitation, normal pulmonary pressures, and ejection fraction of 65%. Plaintiff reported chronic chest pain lasting 3-4 minutes several times per week. The pain occurs without exertion. She had shortness of breath with speaking. She had a dry smoker's cough.  She had one episode of syncope when she was pregnant. Dr. Horton stated that it was difficult to sort out which symptoms were attributable to her mitral valve prolapse or her anxiety. Dr. Horton doubted that they were attributable to ischemic heart disease. She recommended that plaintiff undergo a transesophaegeal echo to determine whether there has been progression toward the need for valve replacement or a right and left heart catheterization. (R. 315-16.)

On October 6, 2008, Dr. Horton noted that plaintiff's mitral valve prolapse was stable on her current therapy and was not clinically significant at this time. Dr. Horton recommended that plaintiff stop smoking. She noted that plaintiff's blood pressure was low and recommended that she stop her medication. Dr. Horton did not believe that plaintiff's chest pain was anginal in nature. (R. 313-14.)

A November 6, 2008 stress echocardiogram revealed that plaintiff had average exercise tolerance. Her chest discomfort with exercise may have be pulmonary. The EKG was negative for myocardial ischemia. There were no arrhythmias. The images were negative for myocardial ischemia.

Michael Stock, M.D. On January 21, 2009, Dr. Stock, a State agency physician, completed a physical residual functional capacity assessment. Dr. Stock opined that plaintiff could occasionally lift and/or carry 50 pounds and frequently lift and/or carry 25 pounds. Plaintiff could stand and/or walk for about 6 hours in an 8-hour day. She could sit for 6 hours in an 8-hour workday. Her ability to push and/or pull was unlimited. Plaintiff could frequently climb ramps or stairs, balance, stoop, kneel, or crawl. She could occasionally climb ladders, ropes or scaffolds and crouch.(R. 342-49.)

On April 4, 2009, Anton Freihofner, M.D. reviewed the record and affirmed the assessment of Dr. Stock. (R. 352.)

John E. Vangilder, M.D. On January 18, 2006, Dr. Vangilder, a cardiologist, performed a consultative examination. Plaintiff reported chest pain and occasional lightheadedness. She was diagnosed with low blood pressure. Dr. Vangilder

6

recommended that plaintiff have a transesophaegeal echo. (R. 364-66.) On October 11, 2006, Dr. Vangilder noted that plaintiff had tightness in her chest and shortness of breath. (R. 362.)

On February 18, 2009, Dr. Vangilder saw plaintiff after a three year absence due to insurance problems. Dr. Vangilder diagnosed mild mitral valve prolapse and hypotension. Plaintiff experienced occasional heaviness and palpitations in her chest. (R. 355.) On April 15, 2009, Dr. Vangilder examined plaintiff to follow up on her hypotension and mitral valve prolapse. She complained of blackouts, but she did not lose consciousness completely. She felt lightheaded when standing. She experienced midsternal chest pain, which was sharp and worse when coughing. (R. 354.)

On May 19, 2009, Sayynanrayana Mamidi, M.D., a colleague of Dr. Vangilder, saw plaintiff for follow up care. Dr. Mamidi noted that she was doing well and that her blood pressure had improved. She had mitral insufficiency murmur. No heart failure was seen. She had polycythemia. Dr. Mamidi instructed plaintiff on how to eat correctly to avoid hypoglycemia. (R. 428-29.) On August 25, 2009, Dr. Mamidi indicated that plaintiff was doing well clinically and had had no recurrence of syncope. (R. 426.)

On May 18, 2009, plaintiff was treated at the emergency room following a fall in which she injured her lumbar spine. (R. 382-83.)

Micahel Sayegh, M.D. On July 21, 2009, Dr. Sayegh performed an initial consultation for further evaluation and possible treatment for her mid back pain. Plaintiff reported burning and throbbing pain. She identified her pain as an 8 on a ten-

7

point scale. On physical examination, she had tenderness in her mid back and trigger points bilaterally and in the paraspinal muscles. Neurological examination of the upper extremities showed mild decreased sensation in the lateral aspect of both forearms. Dr. Sayegh diagnosed thoracic pain, radiculopathy, sprain/strain, anxiety, depression, and a sleep disturbance. He prescribed Vicodin. (R. 401-02.)

An August 5, 2009 exam of plaintiff's thoracic spine revealed congenital block vertebra at the T3-4 level. There was no evidence of disc herniation, central canal or neural foraminal compromise. (R. 400.)

**Psychological Impairments.**

Richard L. Meilander, Ph.D. On August 20, 2007, Dr. Meilander, a psychologist, completed an evaluation at the request of the Bureau of Disability Determination. Plaintiff reported that she is prescribed Xanax, 0.5 mg, twice daily for anxiety. She reported that she does not associate with her neighbors and that she does not like to go out. The longest that she held a job was for one month when she worked as a housekeeper for Comfort Inn.

On mental status examination, Campbell exhibited flat affect and reported that her mood was not very good. She said she was very angry. Her eye contact was fair in quantity and fair to poor in quality. She described her appetite as not too bad. Her sleep was not too good. She had problems falling asleep and staying asleep. She had about five hours of restless sleep without sleep medication. She felt helpless, hopeless and worthless two times per week. She had suicidal ideation in the past month. She

8

exhibited slight psychomotor agitation. She reported feeling depressed. Her energy level was poor. She had little motivation. She experienced racing thoughts and irritability.

Campbell reported shaking, fidgeting, tremor, vigilance, scanning, and hyperventilating two to three times per month. Plaintiff believed that she misunderstood or misinterpreted others 75% of the time. She was suspicious of new people. She feels hostile towards others and can be aggressive.

Campbell had fair to poor memory with respect to past events, but her memory for present events was good. She had average working memory. Her judgment ranged from fair to poor.

Her daily activities included caring for her 8-year old son, cleaning house, watching television, playing video games, and preparing meals. She no longer enjoyed playing cards, going to movies, or visiting friends.

Dr. Meilander diagnosed major depression, single episode, severe without psychotic features and panic disorder with agoraphobia. He assigned her a Global Assessment of Functioning ("GAF") score of 45. Dr. Meilander concluded that plaintiff's ability to relate to others including co-workers and supervisors was fair to poor, which resulted in a moderate impairment. Plaintiff had minimal impairment of her abilities to understand and follow directions and to maintain attention to perform, simple repetitive tasks. Plaintiff's ability to tolerate work stress and pressures associated with day-to-day work was severely impaired.  (R. 279-83.)

David Dietz, Ph.D. On September 26, 2007, Dr. Dietz, a State agency reviewing psychologist, completed a psychiatric review technique and a mental residual functional capacity assessment. He noted that plaintiff was diagnosed with major depressive disorder and panic disorder with agoraphobia. Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (R. 284-97.)

Dr. Dietz opined that plaintiff was not significantly limited with respect to understanding and memory. With respect to sustained concentration and persistence, she was moderately limited in her abilities to maintain attention and concentration for extended periods and to work in coordination with or proximity to others without being distracted by them. She was also moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. With respect to social interaction, plaintiff's abilities to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness were moderately limited. With respect to adaptation, plaintiff's ability to respond appropriately to changes in the work setting were moderately impaired.

10

Dr. Dietz did not give the consultative examiner full weight because there was nothing to support his opinion that plaintiff's ability to handle changes in the work place was severely impaired. Dr. Dietz noted that plaintiff had no psychiatric treatment, no episodes of decompensation or even increases in her medication from her primary care physician. He primary care physician's report did not suggest any difficulties. Dr. Dietz concluded that plaintiff's allegations appeared credible. Dr. Dietz opined that plaintiff was capable of completing some mildly complex tasks that do not involve strict production standards or schedules, but she would be unable to interact on a frequent basis with the general public. (R. 298-301.)

James N. Spindler, M.S. On December 3, 2008, Mr. Spindler, a psychologist, completed a clinical interview to assess Campbell's mental status at the request of the Bureau of Disability Determination. On mental status examination, plaintiff did not appear to be depressed. She was tense and did not relax as the session progressed. She reported that she generally slept through the night. She reported recent suicidal thoughts. She had poor energy. She had difficulty controlling her anger. She described herself as a worrywart, and despite her medication, she always felt anxious.

Plaintiff woke up in the morning by 8 o'clock. She helped her son get ready for school. She washed dishes, swept floors, and did laundry. She had three friends with whom she enjoyed talking, visiting, and playing cards. She helped her son with his homework.

Mr. Spindler diagnosed generalized anxiety disorder; depressive disorder, not

11

otherwise specified in partial remission; and a personality disorder not otherwise specified with antisocial features. Although he estimated Campbell's functional GAF to be 60, Spindler assigned a GAF score of 50 based on her severity of symptoms and level of functioning during the past week. Mr. Spindler concluded that plaintiff was moderately impaired in her ability to relate to others based on her anxiety and personality disorders. She had a longstanding problem with controlling her temper and had been physically aggressive towards others. She reported that she had difficulty getting along with coworkers and supervisors. Plaintiff was not impaired with respect to understanding, remembering, and following instructions. Her ability to maintain attention, concentration, persistence, and pace was not impaired. Her ability to withstand the stress and pressure associated with day-to-day work activities was moderately impaired. (R. 317-22.)

Todd Finnerty, Psy.D. On December 18, 2008, Dr. Finnerty, a State agency reviewing psychologist, completed a mental residual functional capacity assessment and a psychiatric review technique. He concluded that plaintiff was not significantly limited with respect to understanding and memory. With respect to sustained concentration and persistence, plaintiff was moderately limited in her abilities to maintain attention and concentration for extended periods and in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. With respect to social interaction, plaintiff was moderately

12

limited in her abilities to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. With respect to adaptation, plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting. Dr. Finnerty opined that plaintiff could perform static duties in settings with superficial interactions with others without fast pace. She could interact in situations that do not require resolving conflict or persuading others to follow demands. Plaintiff's allegations appeared credible and consistent.

Dr. Finnerty concluded that plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (R. 324-41.)

On March 10, 2009, John Waddell, Ph.D. reviewed the evidence in the prior and current files and affirmed the assessment of Dr. Finnerty. (R. 351.)

Six County, Inc. On May 14, 2008, plaintiff sought counseling to address her difficulty being around people, anxiety, panic attacks, and difficulty controlling her anger. (R. 409-20.) On August 15, 2008, plaintiff reported taking five or six Xanax per day. When she ran out of her medication, she "smoked more weed." (R. 423.) On November 10, 2008, plaintiff reported to Ms. Morris that she had had an altercation with her mother, who called the police. A warrant was issued for plaintiff's arrest. She

turned herself in, and the charges were eventually dropped. (R. 405.) On August 11, 2009, plaintiff was terminated from counseling because she had not returned. (R. 407-08.)

Edward L. Colby, D.O. Dr. Colby, Campbell's primary care physician, diagnosed depression since 2002. (R. 254-55.) He prescribed Xanax. (R. 256.) The condition was stable with treatment. (R. 255.) He found no deficits in cognitive functioning. There were no restrictions in daily activities. There were no restrictions in interests or social activities noted. (R. 254.) Diagnoses included mitral valve prolapse, right ovaries cyst, benign renal mass, and depression/anxiety. (R. 255.)

John Bova, M.S., CNP-BC, LPC, LICDC. In a January 12, 2010 letter to plaintiff's counsel, Mr. Bova, a certified nurse practitioner with Muskingum Valley Health Centers, reported that he had treated Campbell there from August 2009 through at least March 2010. (R. 449-63.) Intake notes from August 25, 2009 indicate Campbell denied mental health issues in the past. Her current medications included Xanax and Celexa. (R. 463.) On September 22, 2009, Campbell reported sleeping better. Her mood was better than it was. She said she really didn't have anyone to talk to. She reported anxiety about past sexual abuse. (R. 462.) On October 29, 2009, Campbell called and reported that someone broke in while she was out shopping and stole her Xanax and Xanax prescription. Notes indicate she was told that the prescription could not be refilled early. She was advised to go to the Emergency Room if she had symptoms of Xanax withdrawal. (R. 461.) On October 30, 2009, Center notes indicate there was a police

14

report about a stolen Xanax prescription. Progress notes dated November 17, 2009 say
Campbell was miserable without Xanax for two weeks. Now she was sleeping well. Her
motivation was poor. She was not moving toward a plan to address her problems. (R.
460.) On November 17, 2009, Campbell said she needed Xanax, but that her pharmacist
told her she had enough to last through November 30. A prescription was called in, but
she was to be conservative about using it as needed. Notes for November 30, 2009 state
there is a consistent pattern of Campbell consistently filling her Xanax prescriptions
early. Her existing prescriptions should leave her well-stocked with Xanax until
Christmas. Wellburtin was to be substituted for Xanax. (R. 459.) On December 2, 2009,
Campbell called in and was angry about the letter saying she would no longer be
prescribed Xanax. She threatened to quit treatment unless she got the needed
medication. (R. 457.) On December 7, 2009, a note indicated the Center would send
Campbell information about how to wean herself off Xanax and why that was
necessary. (R. 457.) On January 12 and again on February 9, Campbell failed to show for
appointments. (R. 456, 454 .) On January 14, 2010, Campbell called and asked for
something for her nerves. The notes indicate they can no longer prescribe a
benzodiazepine for her and instruct the staff to ask her to make an appointment to
discuss other anxiety medications. (R. 455.) On February 22, 2010, Campbell telephoned
requesting Xanax. She said the Wellburtin wasn't working and she was about to go
crazy. However, the notes indicate that Campbell had been told in December that no
Xanax or other benzodiazepine would be prescribed. (R. 453.) On March 2, 2010,

15

Campbell's mood was depressed and anxious. She had a plan for suicide, and they discussed how suicide runs in families. (R. 452.) On March 30, 2010, Bova's treatment notes state that Campbell was sleeping only five hours a night. She was depressed and anxious. He affect was bland to flat. She denied suicidal ideation. (R. 451.)

Bova reported that plaintiff met the criteria for post-traumatic stress disorder. Plaintiff exhibited distress reactions, feelings of helplessness, recurring dreams and flashbacks, avoidance of interpersonal contact, diminished interest in activities, increased arousal, and social, familial, and occupational dysfunction. Mr. Boava noted that plaintiff's prognosis was guarded. (R. 432.)

Mr. Bova completed a questionnaire as to mental residual functional capacity. He opined that plaintiff moderate limitations in her abilities to accept instruction or respond appropriately to criticism from supervisors, to respond appropriately to coworkers or peers, and to relate to the general public and maintain socially appropriate behavior. With respect to sustained concentration and persistence, plaintiff was moderately limited in her abilities to perform and complete work tasks, to maintain attention and concentration for more than brief periods of time, and to perform at production levels expected by most employers. She was markedly limited in her ability to work in cooperation with or in proximity to others without being distracted by them. With respect to adaptation, plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting. She was markedly limited in her abilities to behave predictably, reliably and in an emotionally stable manner and to tolerate

16

customary work pressures. (R. 433-35.)

**<u>Administrative Law Judge's Findings.</u>**

1.  The claimant has not engaged in substantial gainful activity since September 10, 2008, the application date (20 CFR 416.971. *et seq*.).

2.  The claimant has the following severe impairments: hypotension with syncopal episodes; mitral valve prolapse/mild regurgitation; lumbar and thoracic contusion/sprain/spasm with chronic pain and radiculopathy; major depression, single episode, severe without psychotic features; posttraumatic stress disorder; generalized anxiety disorder; personality disorder with antisocial features; panic disorder with agoraphobia; and cannabis abuse (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift up to 20 pounds occasionally; lift and carry 10 pounds frequently in light work as defined by the regulations. However, she may stand/and or walk for up to 1 hour at a time, and requires a 15 minute break before standing again, and must be allowed to sit or stand at will provided she is not off task more than 10% of the work period. She may occasionally climb ramps and stairs, bend, balance, stoop, kneel, and crouch, but may never climb ladders, ropes or scaffolds or crawl. She must avoid concentrated exposure to extreme cold, vibration, and hazards such as moving machinery and heights. She is fully capable of learning, remembering and performing unskilled simple, routine, and repetitive work tasks performed in a low stress work environment, defined as one in which there is not production pace, no quota requirements, no strict time standards, and no "over-the-shoulder" supervision. She may have occasional and superficial contact with supervisors and co-workers, and minimal to no contact with the public.

5.  The claimant has no past relevant work (20 CFR 416.965).

6.     The claimant was born on August 11, 1978, and was 30 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.     The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since September 10, 2008, the date the application was filed (20 CFR 920(g)).

(R. 11-25.)

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'"  *Id*.  *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court

must "'take into account whatever in the record fairly detracts from its weight.'" *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.** Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge failed to follow Social Security Ruling 06-3p with respect to the opinion of Campbell's treating psychiatric nurse practitioner. Plaintiff argues that the administrative law judge failed to consider the opinion of her treating psychiatric nurse practitioner because he was not an "acceptable medical source." Medical sources, such as nurse practitioners, may be entitled to greater weight than an acceptable medical source when the medical source has seen the individual in a professional capacity more often than an acceptable medical source and has greater knowledge of their functioning over time. Plaintiff maintains that Mr. Bova treated her once a month for a year. His opinion was well supported and detailed the diagnostic techniques upon which it was based. Mr. Bova had the longest treatment relationship of any source in the record related to her mental impairment, and, as a result, he had the most comprehensive longitudinal picture of the effects of her impairment over time. Plaintiff also maintains that Dr. Bova's opinion was supported by other examining sources in the record.

- <u>The administrative law judge improperly assigned great weight to the opinions of the State agency reviewers</u>. Plaintiff argues that the opinions of State agency consultants can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence. The opinions of State agency reviewers are entitled to greater weight than examining sources in limited circumstances, such as where they are based on a review of a complete case record with more detailed and comprehensive information than was available to the other sources. Plaintiff maintains that the opinions of Drs. Finnerty and Dietz were not entitled to the weight accorded them by the administrative law judge because they were not based on a review of a more detailed and complete case record Mr. Bova's opinion. Plaintiff maintains that the opinions of the reviewing psychologists were inconsistent with the preponderance of the evidence concerning her severe mental impairments and were not based on the complete record. Plaintiff maintains that Mr. Bova and the clinical examiners all found that she had severe symptoms and limitations. Plaintiff further argues that the opinions from the clinical examinations of Richard L. Meilander, Ph.D., and James M. Spindler, M.D., should have been given greater weight than the State agency reviews. As a general rule, examining sources are given greater weight than nonexamining sources. Dr. Meilander's opinion were consistent with the opinions of Mr. Spindler and Mr. Bova. His

opinion was based on psychiatric signs observed during his exam.

- The testimony of the vocational expert was not supported by substantial evidence. Plaintiff argues that the administrative law judge failed to resolve discrepancies between the vocational expert's testimony and the *Dictionary of Occupational Titles* ("DOT"). Although the administrative law judge asked the vocational expert whether his testimony was consistent with the DOT, on cross-examination it was clear that his testimony was not consistent. The vocational expert acknowledged that his testimony on jobs that allowed a sit/stand option was inconsistent with the DOT. Plaintiff further argues that the jobs presented by the vocational expert cannot be performed by a person with the limitations posed in the hypotheticals because they required mroe than simple, routine and repetitive tasks.

**Analysis.**  A nurse practitioner working for a mental health care provider is not an acceptable medical source.  20 C.F.R. § 404.1513(a).  Nonetheless, the Commissioner will consider evidence from other sources "to show the severity of your impairment(s) and how it affects your ability to work." 20 C.F.R. § 404.1513(d).  Social Security Ruling 06-03p, 2006 WL 2329939, provides that the same factors used to evaluate the opinions of "acceptable medical sources," see 20 C.F.R. §§ 404.1427(d) and 416.927(d), "can be applied to opinion evidence from 'other sources.'" See, *Gayheart v. Commissioner of Social Security*, __ F.3d ____, _____, 2013 WL 896255, *14 (6th Cir. March 12, 2013). Those

factors include:

- How long the source has known and how frequently the source has seen the individual;
- How consistent the opinion is with other evidence;
- The degree to which the source presents relevant evidence to support an opinion;
-  How well the source explains the opinion;
- Whether the source has a specialty or area of expertise related to the individual's impairment(s), and
- Any other factors that tend to support or refute the opinion.

SSR 06-03p. These factors "represent basic principles that apply to the consideration of all opinions from medical sources . . . who have seen the individual in their professional capacity." *Id.*

Here, the administrative provided specific reasons for not affording Mr. Bova's opinion any weight :

> The opinions propounded by John Bova, Psychiatric Nurse Practitioner, on January 12, 2010, are afforded no weight as they were not rendered by an acceptable medical source and are not supported by the longitudinal evidence of record. In fact, Mr. Bova's own counseling notes do not support such extreme limitations; they appeared to be based on solely upon the subjective representations of the claimant (Exhibit B-21F).

(R. 24.) Although a source that is not an acceptable medical source may be entitled to controlling weight, the administrative law judge relied on other substantial evidence in the record in determining how much weight to give Mr. Bova's opinion. Mr. Bova's opinion was inconsistent with the opinions of the reviewing and examining psychologists. Mr. Bova's relied on plaintiff's subjective representations, and the administrative law judge concluded that plaintiff's allegations were not entirely

22

credible.

   <u>Weight Accorded the Reviewing and Examining Psychologists</u>. With respect to

Dr. Meilander, the administrative law judge stated:

> [O]n August 20, 2007, Dr. Meilander opined that the claimant had
> moderate impairment in relating to others; mild impairment in her ability
> to understand, maintain attention, and follow instructions; and severe
> impairment in her ability to tolerate stress at work. He felt that the
> claimant's global assessment of functioning level was 45, reflecting serious
> impairment in social or occupational functioning (Exhibit B-3F). The
> undersigned gives some weight to the opinion of Dr. Meilander with
> regard to the claimant's ability to relate to others as well as her ability to
> understand, maintain attention, and follow instructions; however, there is
> nothing to support a severe impairment in the claimant's ability to handle
> changes in the work place or a global assessment functional level of 45.
> The claimant had no psychiatric treatment/hospitalizations, no episodes
> of decompensation, or even increases in medications by her primary care
> provider; her primary care provider's report did not even suggest
> difficulties. In addition, Dr. Meilander's global assessment of functioning
> level conflicted with assessments at Six County (Exhibit 19F, page 16).

(R. 22.) With respect to Mr. Spindler, the administrative law judge stated:

> On December 3, 2008, Mr. Spindler opined that the claimant's global
> assessment of functioning level was 50, reflecting serious symptoms in
> occupational functioning. Mr. Spindler felt that the claimant had moderate
> limitations in her ability to relate to others, including coworkers and
> supervisors as well as in her ability to withstand the stress and pressure
> associated with day-to-day work activities. He opined that the claimant's
> ability to understand, remember, and follow instructions, as well as her
> ability to maintain attention, concentration, persistence and pace to
> perform simple repetitive tasks was not impaired (Exhibit B-9F). The
> undersigned affords some weight to the opinion of Mr. Spindler; although
> the global assessment of functioning level is inconsistent with the
> evidence of record, the propounded mental functional capacity is not.

(R. 23.) Here, the administrative law judge properly evaluated the medical opinions of

the reviewing and examining psychologists. The administrative law judge noted

inconsistencies in Dr. Meilander's opinion with that of other evidence in the record. Dr. Meilander's opinion was based on plaintiff's self-report, which the administrative law judge found were not supported by her previous lack of mental health treatment. The administrative law judge also noted that plaintiff's primary care physician had not indicated that plaintiff had difficulty because of her mental impairment.

The administrative law judge concluded that the GAF score that Mr. Spindler assigned to plaintiff was inconsistent with his overall assessment of plaintiff's abilities. Mr. Spindler found that plaintiff had only moderate impairments in functioning, and a GAF score of 50 was not consistent with only moderate impairments. Although plaintiff maintains that the administrative law judge improperly adopted the opinion of Dr. Finnerty over the examining psychologist, Dr. Finnerty in most respect agreed with Mr. Spinder's opinion.

The administrative law judge provided good reasons for according greater weight to the opinions of Drs. Dietz and Finnerty over those of Dr. Meilander and Mr. Bova and his decision is supported by substantial evidence.

Testimony of the Vocational Expert. Plaintiff argues that the vocational expert testified that his opinion was inconsistent with the DOT and that the administrative law judge failed to account for the discrepancies in the vocational expert's testimony and the DOT. The vocational expert testified that his testimony regarding a sit/stand opinion was based on his experience and external sources because the DOT did not account for a sit/stand option. *Baranich v. Barnhart*, 128 Fed. Appx. 481, 487, 2005 WL

24

894363, at *4 (6th Cir. 2005)(holding that the administrative law judge did not err by including a sit/stand option when such an option is not indicated in the DOT because the DOT is only one source to be used in assessing the availability of jobs for the claimant).The administrative law judge did not err by relying on the testimony of the vocational expert.

From a review of the record as a whole, I conclude that there is substantial evidence supporting the administrative law judge's decision denying benefits. Accordingly, it is **RECOMMENDED** that the decision of the Commissioner of Social Security be **AFFIRMED.  It is FURTHER RECOMMENDED** that plaintiff's motion for summary judgment be **DENIED** and that defendant's motion for summary judgment be **GRANTED.**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto.  28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).

     s/Mark R.  Abel          
United States Magistrate Judge